422 P.2d 196

**The STATE of Utah, Plaintiff and Respondent,**

v.

**Melvin CANFIELD, Defendant and Appellant.**

**No. 10559.**

Supreme Court of Utah.

Jan. 10, 1967.

Francis C. Lund, Salt Lake City, for appellant.

Phil L. Hansen, Atty. Gen., Salt Lake City, for respondent.

CROCKETT, Chief Justice:

Melvin Canfield was convicted of murder in the second degree for shooting and killing Douglas Holland at 649 South 5th East, Salt Lake City, at about 9 o'clock p. m. on the night of May 10, 1965. He seeks reversal of his conviction on the grounds that the evidence does not show the intent necessary to constitute second-degree mur-

der; that the court erred in submitting that offense to the jury; and that it committed error in rulings on evidence.

■ Defendant's case is presented in the all-too-common manner of defense counsel: arguing from his own theory of the evidence that it does not show the necessary intent to justify the verdict. But this is at variance with the correct pattern of procedure on appeal and paints quite a different picture of this case than we are obliged to see. It is our duty to respect the prerogative of the jury as the exclusive judges of the credibility of the witnesses and as the determiners of the facts. Consequently, we assume that they believed the State's evidence, and we survey it, together with all fair inferences that the jury could reasonably draw therefrom, in the light most favorable to their verdict.[1]

It appears that there had been animosity for some time between the defendant Canfield and the deceased Douglas Holland, which had developed over Canfield's attentions to Holland's wife. The Hollands were separated. A divorce action was pending. Canfield had been spending a lot of time at the place where the wife, Dixie Holland, resided. A neighbor said he was there half the time. Dixie said he stayed there only when she was afraid of her husband, or not sleeping well, and that on these occasions they slept in separate rooms. About two weeks before the killing, Holland had chased the defendant from his wife's house with a hammer. Subsequent to this incident, the defendant had stated in the presence of a witness that he would kill Holland if he came around.

On May 9th Holland went to the house and found the defendant's clothes there. He tore them and mussed up the house. The next evening he received a phone call at his car lot at 649 South 5th East. Holland's father was present and heard his end of the conversation. It is deducible from the evidence that the call was from the defendant and/or his pals, who were at a beer tavern, and that some threats were made. Douglas Holland and his father went to the police station to seek assistance, but were told to obtain a complaint from the City Prosecutor. After they returned, the defendant, with three other men, in a car defendant had borrowed from the deceased's wife, drove into the driveway of Holland's place and honked the horn. The father, Mr. Holland, went out and asked them to leave or there would be trouble. Defendant said to him, "Tell that [obscenity] son of yours to come out and pay for my clothes." Douglas Holland then came out on the porch and said, "I believe I am the one you're looking for." He fired a shotgun blast into the lawn some distance away from the car, and started back into the house. He was fumbling with the door latch when the

1. State v. Ward, 10 Utah 2d 34, 347 P.2d 865.

defendant shot him in the back of the hip with a 30.06 rifle. As the defendant backed the car out of the driveway and drove down the street with the lights off, the elder Holland tried to shoot with the deceased's gun but it would not fire. He handed it to the deceased who fired a shot, but apparently not close to the car. Douglas Holland died a few hours later of the rifle shot which had riddled his lower abdomen.

■ In regard to the defendant's argument that the evidence is insufficient to prove his intention to kill, and that he shot in self-defense, certain observations are pertinent. Even if the conduct of Douglas Holland in shooting the shotgun into the ground should be considered as somewhat provocative, the jury could reasonably regard it as no assault upon the defendant but as a warning to him and his "friends" who came there seeking trouble to get off the deceased's property; and that in any event, Holland had turned away from any affray and was going into the house when the defendant shot him, so there was no cause for the defendant to fear for his own safety. There are further circumstances which tend to discredit his contention of innocence: after he shot Holland and drove the car away with the lights out, he did not contact the police,

but rather went into hiding until he was discovered and arrested three days later; and he had given the gun to one of his companions to dispose of.

■ Although proving what a man intended, when there is dispute, is certainly not without difficulty,[2] we are aware of no better nor persuasive way to do it than by showing both what he did and what he said, as was done here. In view of the evidence we have recited above, which we must assume the jury believed, indicating that the defendant had made a threat to kill the deceased; and that he sought him out, shot and killed him, it seems neither surprising nor unreasonable that the trial court submitted the issue, and the jury believed that such was his intent. His conduct comes within the definition we have previously set forth as constituting second-degree murder: that the defendant must have intended either to kill, or to do an act which would naturally and probably cause death or great bodily harm, and from which death resulted.[3]

Defendant assigns error in allowing the deceased's father to testify to certain statements he heard his son make at his end of the telephone conversation, just prior to the crime, as being hearsay. The essentials are that the deceased stated: "Who am

---

2. This has been recognized in the law since time immemorial: "It is common knowledge that the thought of man shall not be tried, for the Devil himself knoweth not the thought of man," written by Brian, J., Y.B. 17 Edw. 4 Pasch., f. 2 (1477); see Insurance Co. v. Dutcher, 95 U.S. 269, 273, 24 L.Ed. 410.

3. See State v. Jensen, 120 Utah 531, 236 P.2d 445; cf. also State v. Russell, 106 Utah 116, 145 P.2d 1003; State v. Thompson, 110 Utah 113, 170 P.2d 153.

I talking to * * * Gordie Adamson." (One of the men who came with the defendant in the car, and who was jointly charged with the defendant for the murder.) The statement which defendant points to as damaging is that deceased made the remark: "Wipe me out, huh." Whether this be regarded as verbal conduct merely showing something the deceased did just prior to the killing which may have some legitimate bearing on the event, or as bearing upon the deceased's state of mind, introduced for that purpose and not to show the truth of what was said, as the trial judge admonished the jury, we do not deem to be of any critical concern here.

 The impropriety the defendant asserts against the above statement is that it suggested some threat had been made against the deceased by Gordie Adamson. Whether it could have had any prejudicial effect must be considered in the light of all of the evidence in the case. We are unable to see how the suggestion of such a threat could have had any effect upon the jury's verdict. When it is looked at in the light of the undisputable facts, supported by the defendant's own evidence, that defendant and the others came to the Holland place anticipating a fight, it appears rather pale and ineffectual. The minimal effect of this evidence is echoed in the defendant's brief in which he argues that the statements in question added nothing to that which was shown by other evidence.

The observation we have made above concerning prejudice is applicable to the final assignment of error: that the court should not have excluded evidence of an occurrence to show deceased's character for violence. There is division among the decided cases as to whether it is competent to show one's reputation or character for violence by a single incident.[4] It may well depend upon the particular circumstances. An important fact here is that, if it could be shown that the deceased was of a violent disposition, this would be material only on the issue of self-defense, and if it were known to the defendent before the crime. This was not shown in the proffer of proof. Additionally, such testimony would have been but cumulative of other evidence in the record, including the defendant's answer to a question whether he knew the deceased had such a reputation:

A. "That's all I have ever heard about the man is that he is extremely violent and constantly waving guns around at people and threatening to kill them."

4. People v. Rodawald, 177 N.Y. 408, 70 N. E. 1 (1904); State v. Velsir, 61 Wyo. 476, 159 P.2d 371, 161 A.L.R. 220 (1945); State v. Cavener, 356 Mo. 602, 202 S.W. 2d 869 (1947); Horne v. State, 116 So.2d 654 (Fla.App.1959); Rothblatt, Handbook of Evidence for Criminal Trials, 252–253 (1965).

The defendant has had all the law entitled him to: a full and fair opportunity, with the aid of competent counsel, to present his case to a jury of his fellow citizens. They have indicated by their verdict that they unanimously believe beyond a reasonable doubt that he was guilty of murder in the second degree.[5] No error has been shown which would justify nullifying their verdict. The conviction is affirmed.

CALLISTER, TUCKETT and HENRIOD, JJ., and JOSEPH E. NELSON, District Judge, concur.

---

5. See statement in State v. Seymour, 18 Utah 2d 153, 417 P.2d 655.