**STATE of Utah, in the interest of J.S.H., a person under eighteen years of age.**

No. 17258.

Supreme Court of Utah.

March 2, 1982.

David L. Wilkinson, Atty. Gen., Robert N. Parrish, Asst. Atty. Gen., Frederick M. Oddone, Deputy Salt Lake County Atty., Salt Lake City, for appellant.

Edward M. Garrett, Thomas C. Sturdy, Salt Lake City, for respondent.

HALL, Chief Justice:

J.S.H. appeals a juvenile court order requiring him to pay restitution in the sum of $2,000 as part of a larger sum allegedly embezzled from a restaurant.

J.S.H., a high school student, worked part-time at the restaurant in question for a period of approximately one and one-half years, beginning as a "bus boy" and later assuming the position of host-cashier. His duties in the latter capacity included greeting guests as they entered the restaurant, seating them and receiving payment from them at the cash register. During periods when J.S.H. was busy or on break, other employees operated the cash register, including the manager, assistant managers and waitresses. J.S.H. worked as a host-cashier from December of 1978 until November of 1979, alternating shifts with at least two other hosts or hostesses.

On November 27, 1979, a routine audit of the restaurant's accounts revealed a $4,442.87 shortage traceable to a series of falsified cash register transactions over the preceding four months. The audit showed that on forty different days during this period, actual cash on hand at the end of the day, as recorded by the restaurant manager or assistant managers on a daily balance sheet, totalled significantly less than the amount which should have been received from customers, as shown by the meal tickets collected. These shortages had previously escaped detection because of a number of improper meal ticket entries on the cash register tape which made the meal ticket totals appear to match the actual cash totals. The restaurant's accountant concluded that some employee with access to the cash register had engaged in a pattern of deliberately "ringing up" meal tickets at amounts lower than those shown on the tickets, placing a corresponding portion of the cash received from customers in the money drawer and pocketing the balance.

Upon the discovery of these cash register "misrings," J.S.H.'s manager asked him whether he knew anything about them. J.S.H. denied any such knowledge. Two days later, he was fired without explanation.

On April 2, 1980, the state filed a petition against J.S.H. in juvenile court,[1] alleging theft in violation of U.C.A., 1953, 76–6–404. That court conducted a hearing in accordance with the provisions of the Juvenile Court Act[2] and found J.S.H. guilty. After a separate dispositional hearing, the court

---

1. See U.C.A., 1953, 78–3a–16(1), 78–3a–22.

2. See U.C.A., 1953, 78–3a–1, et seq.

ordered restitution by J.S.H. of $2,000 of the missing funds. He now appeals on the basis of insufficiency of the evidence.

At J.S.H.'s hearing, the state presented no direct evidence linking him with the improper cash register transactions in question. Rather, the state based its allegations on evidence prepared by Dennis Bartels, the restaurant's accountant, which purported to show that J.S.H. was the only employee who had worked during all the periods when "misrings" occurred. Because at least forty-eight of the restaurant's employees had access to the cash register during the four-month period in question, Bartels compiled a list of employee work schedules and compared this list with the dates when he believed the "misrings" had occurred. Bartels testified that "there was no other person that was working every day other than [J.S.H.] when there was a shortage."

Bartels testified that on the basis of his list of employee work schedules, he had excluded all employees other than J.S.H. from suspicion, including managers and assistant managers. However, the list admitted into evidence by the juvenile court contains neither the name of Shabbir Maklai, J.S.H.'s manager, nor of his assistant managers, William Holly and Wayne Hoffling. Maklai testified that he and his assistant managers all had unlimited access to the cash register.

Bartels' earlier testimony indicates that the list is not necessarily complete even as to nonmanagerial employees. In referring to this list, Bartels corrected himself after stating that the list included "all" employees, as follows:

Yes, it shows all the ... most cashiers and waitresses that were employed during the period of time. [Elipses in original.]

Thus, the list used by Bartels does not eliminate from suspicion every employee other than J.S.H. because it does not include all employees.

The state's evidence connecting J.S.H. to the cash register "misrings" is further weakened by the documentary evidence which allegedly shows the timing of the "misrings." The juvenile court admitted into evidence the "misrung" meal checks and corresponding cash register tapes, balance sheets and deposit slips which Bartels used to determine the dates when improper cash register transactions had taken place. This evidence shows that many of the cash register tapes on which "misrings" have been recorded bear dates different from those on which Bartels claims that the misrings occurred. In assigning dates to these transactions, Bartels apparently relied on the handwritten dates entered by restaurant employees on the balance sheets and deposit slips. However, he acknowledged on cross-examination that in at least one case, the balance sheet (printed on an envelope) showed an incorrect date:

Q: Well where is your October 27th date then if you intend that this should relate to October 27th?

A: No, this is actually September 27[;] it is just the wrong date on the envelope.

In his testimony, Bartels did not explain which sources he used in determining the "misring" dates or why he disregarded the dates printed by the cash register itself next to the "misrings." Bartels stated:

When you adjust the date machine on there it is possible you got the wrong month.

However, Bartels gave no additional information concerning the procedure for adjusting the cash register date, the persons responsible for such adjustments or the likelihood of error in such adjustments. In the absence of specific information concerning the reliability of the sources from which Bartels obtained his list of "misring" dates, his evidence connecting those dates with employee work schedules has little value.

The state produced no witnesses who had observed any incriminating behavior on the part of J.S.H. in connection with any cash register transactions. The evidence showed that J.S.H. was never the only employee with access to the cash register, and the cash register records themselves provide no reliable information concerning the identity of the cash register operator for any given

transaction.[3] Nor did the state establish the possession of unexplained funds or a visible increase in affluence on J.S.H.'s part.[4] Bartels' evidence concerning the timing of the "misrings" constitutes the sole evidence of appellant's guilt. This evidence is wholly dependent upon an incomplete employee list and alleged "misring" dates which conflict with those printed on the cash register tapes themselves.

Notwithstanding the deference due the judgment of the trial court, we are constrained to conclude that the evidence presented fails to meet the applicable standard of guilt beyond a reasonable doubt.[5] Therefore, the judgment and order of the juvenile court cannot be sustained.

Reversed.

STEWART, OAKS, HOWE and DURHAM, JJ., concur.

3. Although Shabbir Maklai testified that employees were instructed to initial the cash register tape after each period during which they operated the cash register, the tapes themselves show that this procedure was rarely followed.

4. The state attempted to show unexplained affluence on appellant's part by establishing that he had offered to take a friend to Alaska at his own expense and that he had recently spent $1,300 to repair damage to his car resulting from an automobile accident. Although appellant admitted these facts, he testified that he had intended to use his own savings to finance the Alaska trip and that he had abandoned the idea of taking such a trip after being forced to spend his savings on car repairs. Appellant further testified that his own funds had not been sufficient to pay the repair bill and that he had obtained the balance by refinancing his car and by borrowing from his parents.

5. *State v. Kerekes*, Utah, 622 P.2d 1161 (1980); *State v. Kourbelas*, Utah, 621 P.2d 1238 (1980); *State v. Granato*, Utah, 610 P.2d 1290 (1980).