STATE of Utah, Plaintiff and
Respondent,

v.

John Wilson PETREE, Defendant
and Appellant.

No. 18015.

Supreme Court of Utah

Feb. 4, 1983.

Scott Jay Thorley, Patrick H. Fenton, Cedar City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Salt Lake City, for plaintiff and respondent.

OAKS, Justice:

A jury convicted defendant of second degree murder of a fifteen-year-old girl who was his high school classmate. He was sentenced to five years to life, and entered upon service of his sentence. On this appeal, he urges that the evidence was insufficient to show that the crime was committed or that he committed it. The prosecution's evidence was essentially undisputed. The parties disagree on the inferences to be drawn from it. The facts are unique.

On July 2, 1980, a man who was otherwise unrelated to the events of this case uncovered a human skeleton by a row of trees along a fence line in the large backyard behind his rented home in Cedar City. The skeleton was about 30 inches below the surface of the ground in an old carrot pit beneath a wooden trap door covered by a mound of earth. The police, who were notified immediately, concluded from the position of the skeleton that the body had been placed in the pit on its chest with the hips bent forward and the legs and arms folded over the back of the body. Along with the skeleton, they discovered a ring, a jacket, a sweater with a pin attached, blue jeans, female underclothing, and a pair of boxer shorts. The medical examiner concluded that the skeleton was that of a female between 14 and 17 years of age, approximately 5 feet 2 inches in height (plus or minus 2 inches). The left forearm had a thickened area indicating a healed fracture. The teeth contained no dental work. Neither the time nor the cause of death could be determined from the skeletal remains.

■ Phyllis Ady, age 15, was reported missing at 1:00 a.m. on December 13, 1977, just over two and one-half years before the skeleton was discovered. At that time, she was residing with her aunt and uncle, the Westmans, who lived approximately one block from where the body was found. Mrs. Westman and Betty Ady, the victim's mother, identified the ring, jacket, sweater, and pin found with the skeleton as Phyllis's. On the basis of that identification and their testimony that Phyllis was 15 years of age, 5 feet 4 inches in height, had no dental work, but had earlier suffered a fracture of the left forearm that had healed, the jury had ample evidence to conclude that the skeletal remains were those of Phyllis Ady.

■ The evidence summarized above also met the requirement of corpus delicti, which, we have said, "requires only that the State present evidence [1] that the injury specified in the crime occurred, and [2] that such injury was caused by someone's criminal conduct." *State v. Knoefler,* Utah, 563 P.2d 175, 176 (1977). *Accord: State v. Kim-* *bel,* Utah, 620 P.2d 515, 517 (1980); *State v. Cazier,* Utah, 521 P.2d 554, 555 (1974). In this case, the "injury" in the first part of the definition is the death of a human being. As for the second requirement, it is unnecessary to show cause of death or to provide evidence on the specific degree of homicide. The State need only present evidence that the death resulted from criminal conduct rather than by accident or from natural causes. "The criminal agency causing death may be proved by circumstantial evidence and the reasonable inferences to be drawn therefrom." *People v. Miller,* 71 Cal.2d 459, 78 Cal.Rptr. 449, 459, 455 P.2d 377, 387 (1969). That was done in this case. The concealment of the skeletal remains and the unnatural position of the body provided sufficient evidence from which the jury could conclude that Phyllis Ady died from criminal activity.

■ This appeal turns on whether there was sufficient evidence for the jury to convict defendant of the crime of second degree murder for "intentionally or knowingly" causing the death of Phyllis Ady. In considering that question, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury. We reverse a jury conviction for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted. *State v. Kerekes,* Utah, 622 P.2d 1161, 1168 (1980); *State v. Lamm,* Utah, 606 P.2d 229, 231 (1980); *State v. Gorlick,* Utah, 605 P.2d 761, 762 (1979); *State v. Daniels,* Utah, 584 P.2d 880, 882–83 (1978); *State v. Romero,* Utah, 554 P.2d 216, 219 (1976).

■ In view of what is said in the dissent on this subject, we deem it desirable to emphasize that notwithstanding the presumptions in favor of the jury's decision this Court still has the right to review the sufficiency of the evidence to support the verdict. The fabric of evidence against the defendant must cover the gap between the

presumption of innocence and the proof of guilt. In fulfillment of· its duty to review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict, the reviewing court will stretch the evidentiary fabric as far as it will go. But this does not mean that the court can take a speculative leap across a remaining gap in order to sustain a verdict. The evidence, stretched to its utmost limits, must be sufficient to prove the defendant guilty beyond a reasonable doubt. *State in re J.S.H.,* Utah, 642 P.2d 386 (1982); *State v. Kourbelas,* Utah, 621 P.2d 1238, 1240 (1980).

 Viewed in the light most favorable to the jury's verdict, the evidence against the defendant was as follows. At the time Phyllis disappeared, she and defendant were both 15 years of age. They lived about a half block apart on 900 West in Cedar City, she with the Westmans and he with his mother. They attended the same school, but they apparently did not have a dating relationship. Phyllis's aunt testified that before December 12, 1977, defendant had been to their home on only one occasion, the day before, when he merely came to the door to inquire if Phyllis was home.

As she was driven past defendant's house at about 6:00 p.m. on December 12, Phyllis asked to be let off. Mrs. Westman observed defendant, who had been sitting on his porch, walk out to meet Phyllis in the road. Mrs. Westman never saw Phyllis again. When Phyllis had not come home at about 9:00 or 9:30 that evening, Mrs. Westman went to defendant's home but found no one there. Sometime between 10:30 p.m. and midnight, she returned and, when defendant answered the door, asked about Phyllis's whereabouts.[1] He replied that he did not know, that she had left him and gone with a blonde long-haired fellow defendant did not know. At 1:00 a.m., Mrs. Westman reported Phyllis missing.

On the evening of December 12, before 8:00, defendant telephoned his sister in Las

Vegas. He told her that "he was getting a hassle at home and in school and he wanted to come down." He phoned again the next morning. His sister then drove to Cedar City, picked him up about noon, and drove him back to Las Vegas. Defendant then stayed with his sister and her husband in Las Vegas for about four days.

Aside from whatever inference might be drawn from the fact that defendant was the last person seen with Phyllis before she disappeared and the fact that he left Cedar City the day after· she disappeared, the only evidence of defendant's guilt of murder in the second degree were statements he made to three family members during his visit in Las Vegas and a statement he made to a girl friend two years later. There was no other evidence of admissions, no physical evidence, and no motive for the homicide.

All of defendant's statements to family members concerned an experience he had during his four-day visit to Las Vegas. His sister and her husband heard him screaming in the night, before midnight. Concluding that he was having a nightmare, they took him into the kitchen to talk about it. The various witnesses' accounts of what was said are critical, and are therefore quoted here in their entirety.

Alisa Backstoce, defendant's sister, testified as follows:

Q. Mrs. Backstoce, can you tell me in substance and effect what was said and by whom in this conversation around your kitchen table?

A. We asked Johnny what his nightmares was about. He said he was having a nightmare about walking with a girl and she slapped him and that's all he remembered, and then waking up taking a bath and her folks, the girl's folks pounding on the door wanting to know where she was.

Q. All right. Did he say anything else about the girl, other than just what you've told us?

---

1. Neither defendant's mother nor the man who boarded with them nor Mrs. Westman noted anything unusual about defendant's appearance or demeanor when they saw him at various times between 9:00 p.m. and midnight on December 12.

A. Later he said he thought he had hurt or killed a girl, but he wasn't sure.

In context, and by its literal terms, this testimony clearly referred to the content of Johnny's (defendant's) dream, although the last quoted answer might be subject to the interpretation that it referred to an actual occurrence.

The testimony of James Backstoce, which is quoted in the footnote,[2] clearly refers solely to the defendant's explanation of the dream that had awakened him. In content, it is consistent with his wife's account.

Robert Petree, defendant's brother, testified that he went to the home in Las Vegas during his brother's four-day visit to tell him that the Cedar City Police were looking for him to question him about the disappearance of a young girl. Robert told his brother he was going to return him to Cedar City. The testimony continued as follows:

Q. All right. What happened, then, after that; was there anything further said?

A. Yes. Alisa told me about these nightmares that she had been woken up. I don't remember how many times or what different nights. But she said that she had been awoken by his screaming in the night.

Q. All right. Did you have any further conversation about that with your brother?

A. Yes, sir. I asked him, you know, was there something wrong or was something bothering him.

Q. What did he tell you?

A. Well, he proceeded to tell me that he was walking through a field with—I took it as a young girl. He didn't say what girl or who it was, but she slapped him. He blacked out. And then he goes on from there to say about the dreams.

Q. Okay, what did he tell you about the dreams?

A. Okay. The dream, that was described to me from him, and my sister both, that—

Q. What did he tell you about the dream, not what your sister told you, but what did he tell you?

A. What he told me about the dream, that when he blacked out and he started to dream that he—his words were he thought he hurt her. He thought he might have killed her.

In context, it is clear that the statements related in Robert's testimony were entirely concerned with defendant's dream and not with actual events.[3] This was further emphasized in the cross-examination as follows:

Q. Now if I understand you correctly, you have been sitting here repeating what Mr. Petree told you about a dream he had had, is that correct?

A. Yes, sir.

The only other evidence of defendant's guilt came in the testimony of Debra Wilson, a girl who had dated defendant in Las Vegas or California in the winter of 1980,

2. A. We all sit down at the kitchen table and discussed what had disturbed him to wake him up like that.
[Here followed several questions and answers about the physical surroundings where the conversation took place and who was present, as well as defense counsel's objection, denied, on admissibility. The testimony then continued as follows:]
Q. Mr. Backstoce, again, what was said and by whom at this conversation?
A. The things we were discussing with Johnny and, of course, the girl that was missing. And during the discussion—
Q. Okay, would you please tell us who said what.
A. Well, John said that he was walking the girl home and the girl slapped him and that

was the last thing he remembered till he woke up taking a bath in the tub.
Contrary to the interpretation in the dissent, the first answer quoted here makes clear that the entire testimony related to the content of defendant's dream.

3. This is further authenticated by Robert Petree's unambiguous and repeated testimony to the court during a hearing out of the presence of the jury on defendant's unsuccessful contention that the "admission" was inadmissible because the State had not proved the corpus delicti. In this hearing, Petree testified that all of the statements he had repeated from the defendant "came out of one of Johnny's dreams."

more than two years after Phyllis disappeared. She testified that during one of their conversations defendant told her that he had gotten into a fight with a girl in Utah. He mentioned no names, dates, or other details. His statement about this event, as described in the witness's testimony, which is quoted in full in the footnote,[4] was so inconsequential to this witness that she said it "just passed through one ear and out the other." In short, it could have referred to any of a variety of real or exaggerated events in the dating life of a teenager. There was no other evidence of guilt.

In response, the defense entered a stipulation that none of the "items" recovered from the clothing in the pit or from a nearby shed matched the hair samples taken from the defendant. A girl friend of Phyllis's testified that when Phyllis left her at about 6:00 on the evening of December 12 she said she was on her way to meet a Ken Perkins, with whom the witness was casually acquainted as a person who lived nearby who wanted to date Phyllis.[5] Other defense witnesses testified that they thought they had seen Phyllis alive at various places in the months following her disappearance. In the posture of this appeal, we must assume that the jury placed no credence in any of this testimony. On the other hand, contrary to the suggestion in the dissent, the fact that the jury did not believe the defense implication that Perkins was a viable suspect adds little or no strength to the case against the defendant. Though the identification of another person as a probable perpetrator may help a defendant in securing an acquittal, his failure to identify another suspect provides no evidence of his guilt. A defendant must be convicted on the strength of the evidence against him, not on the weakness of the evidence against someone else. Defendant's conviction must stand or fall on the content of and inferences that can be drawn from the prosecution's evidence.

The verdict of guilty of murder in the second degree rests entirely on testimony of defendant's meeting Phyllis on the street on the evening she disappeared, his trip to Las Vegas on the day following, and on three witnesses' testimony of defendant's statements to them in Las Vegas. Interpreted most favorably to the prosecution, those statements refer entirely or almost entirely to defendant's descriptions of his strange dream. The testimony that he told a date two years later that he once had a fight with a girl in Utah adds nothing of substance on this issue.

While the evidence was sufficient for the jury to conclude that the death of Phyllis Ady involved criminal activity (the corpus delicti), the evidence was not sufficient to prove, beyond a reasonable doubt, that defendant caused Phyllis Ady's death. Even if the evidence proved that defendant caused her death, it was manifestly insufficient to prove that he did so "intentionally or knowingly," as was charged in this complaint for murder in the second degree. U.C.A., 1953, § 76–5–203(1)(a).

The conviction is reversed and the defendant is ordered discharged from custody.

STEWART and HOWE, JJ., concur.

---

4. Q. Again, Miss Wilson, can you tell me in substance and effect what was said and by whom in this conversation . . . .
A. He had told me that he had gotten in a fight with a girl in Utah. He didn't mention any names. And he came home and he couldn't remember nothing afterwards.
Q. All right, did he say anything else about what condition he was in when he came home?
A. Just that he remembered getting in a fight and I guess he had blood on his shirt; that was what was mentioned, and he couldn't remember nothing.

5. The record shows that Perkins had resided between the lot where the skeleton was found and the McDonald's restaurant, whose parking lot abutted that lot in the rear (along the fence line by the pit). In rebuttal, the prosecution showed that Perkins had a record of narcotics offenses, that his place of residence had been torn down the preceding August, and that he had moved away from Cedar City prior to that time. The prosecution introduced a "mug shot" of Perkins, and the witness who had mentioned him (Phyllis's girl friend) was unable to identify it.

**HALL, Chief Justice (dissenting):**

I premise my dissent upon the following time-honored rule of appellate review:

> It is the *exclusive function of the jury to weigh the evidence* and to determine the credibility of the witnesses, and it is *not within the prerogative of this Court to substitute its judgment for that of the factfinder.*[1] [Emphasis added.]

The main opinion reaches a conclusion contrary to that of the jury and trial court by substituting the judgment of this Court, as to the weight and sufficiency of the evidence for that of the jury, in direct contravention of the foregoing.

The standard of review to which this Court is bound when faced with insufficiency of evidence claims was very recently stated in *State v. McCardell:*[2]

> This Court will not lightly overturn the findings of a jury. We must view the evidence properly presented at trial in the light most favorable to the jury's verdict, and will only interfere when the evidence is so lacking and insubstantial that a reasonable man would not possibly have reached a verdict beyond a reasonable doubt. We also view in a light most favorable to the jury's verdict those facts which can be reasonably inferred from the evidence presented to it. "Thus, intent to commit [a crime] . . . may be found from proof of facts from which it reasonably could be believed that such was defendant's intent." [Citations omitted.]

This Court also adheres to the general appellate rule that a trial court's judgment has a presumption of validity in an appellate court. We held in *Burton v. Zions Cooperative Mercantile Institution:*[3]

> There is a presumption that the judgment of the trial court was correct, and every reasonable intendment must be indulged in favor of it; the burden of affirmatively showing error is on the party complaining thereof.

I have no quarrel with the proposition that this Court has the prerogative to determine the sufficiency of the evidence. However, in doing so, the main opinion fails to follow the more fundamental rule that requires us to view the evidence and all inferences to be drawn therefrom in a light most favorable to the jury verdict. Rather, it assumes the role of fact-finder, surveying the evidence in the record and drawing therefrom independent conclusions as to its weight, sufficiency and effect. Such is not the role of this Court.

The main opinion concludes that a relationship did not exist between defendant and the victim by reason of the fact that defendant had visited the victim's home on only one occasion prior to December 12, 1977. This conclusion does not reflect a view of the evidence in the light most favorable to the jury's verdict. The fact that defendant's "one" visit occurred the very day before the victim disappeared could reasonably have prompted the jury to infer that some form of relationship was developing or had developed between defendant and the victim.

In an attempt to cast doubt as to defendant's being the perpetrator of the offense, the defense presented evidence that Miss Ady's plans on the evening of her disappearance included a visit to one Ken Perkins. The defense intended thereby to implicate Ken Perkins as the person described by defendant as having long, blonde hair, with whom the victim allegedly left on the eve of her disappearance.

The testimony regarding Ken Perkins was shown to be unreliable and inconsequential, and therefore apparently disbelieved by the jury.[4] Inasmuch as this was

---

1. *State v. Lamm,* Utah, 606 P.2d 229, 231 (1980).

2. Utah, 652 P.2d 942 (1982). *See also State v. Romero,* Utah, 554 P.2d 216 (1976); *State v. Lamm, supra* n. 1.

3. 122 Utah 360, 259 P.2d 514, 518 (1952). *See also People v. Miller,* 78 Cal.Rptr. 449, 78 Cal. Rptr. 449, 455 P.2d 377 (1969).

4. Christa Allred's testimony, being the only testimony regarding Miss Ady's acquaintance with Ken Perkins, was countered by the following: The State showed that the house where

the only evidence presented by the defense of an alternative suspect, and it failed, defendant, being the last person positively seen with the victim, was left as the only possible and viable suspect. Therefore, contrary to the conclusion reached in the main opinion, the failure of defendant's evidence to implicate Perkins does add strength to the evidence against defendant as the perpetrator of the crime.

The State's evidence showed that defendant abruptly left town the very day the victim was reported missing. According to the record, defendant called his sister in Las Vegas, Nevada, on the night of December 12, 1977, at approximately 8:00 p.m. (only two hours after he had been seen with the victim), and again on the following morning. He told her of his distressful situation at home and at school and asked her if she would come at once and get him. She drove from Las Vegas that very day (December 13), and took defendant back to her home, where he remained until he was returned to Cedar City by his older brother four days later.

The unexplained and undisputed evidence of defendant's departure from Cedar City immediately following the victim's disappearance gives rise to an inference of his guilt.[5] This Court has held:

> Flight and concealment immediately following the commission of a crime are both elements which may be considered as evidence of implication in that crime.[6]

The jury could therefore draw an inference of guilt from defendant's abrupt departure from the state.

The main opinion draws the conclusion that defendant's statements to his relatives concerning the content and cause of his nightmares were not actual admissions, but rather were mere accounts of dreams bearing insufficient weight to support an inference of defendant's guilt. However, it is not this Court's prerogative to draw such conclusions and thereby substitute its judgment as to the weight and sufficiency of evidence for that of the jury. The jury, upon weighing the testimony regarding defendant's statements in conjunction with the other evidence, deemed the statements to be supportive of the inference of guilt. Furthermore, the conclusion that defendant's statements were mere accounts of dreams, rather than of an actual occurrence, is not supported by the record, nor does it reflect a review of the facts in "a light most supportive of the findings of the trier of fact." Also, the main opinion assumes that the accounts of his dreams could not, under any circumstances, give rise to an inference of guilt. Here again, it is not for this Court to make such an assumption. Particularly is this so under the facts and circumstances of this case.

A thorough and exacting review of the record, in a light most favorable to the jury verdict, reveals certain inconsistencies and inaccuracies in the analysis of the evidence in the main opinion regarding defendant's statements. The first witness to testify of defendant's confessions was James Backstoce, the defendant's brother-in-law.[7] The

---

Perkins had resided had been torn down since early August, 1977, and that Perkins had left Cedar City sometime prior to that date. The State also introduced into evidence a mug shot of Perkins, which was identified by the Cedar City Police Chief. Miss Allred, having been called to the witness stand once and having then testified that she knew who Perkins was and what he looked like, was called back to the stand and asked if she could identify the person in the mug shot. She could not. Her failure to identify the individual as Perkins cast a shade of unreliability on her information and testimony regarding him. Furthermore, the mug shot revealed Perkins' hair color to be black, thus precluding an inference that Perkins was the

same person described by defendant as the one with whom he last saw the victim.

5. *See State v. Hardison,* N.M.App., 467 P.2d 1002 (1970); *State v. McCormick,* 28 Or.App. 821, 561 P.2d 665 (1977).

6. *State v. Simpson,* 120 Utah 596, 236 P.2d 1077, 1079 (1951). *See also State v. Marasco,* 81 Utah 325, 17 P.2d 919 (1933).

7. The pertinent part of Mr. Backstoce's testimony reads as follows:
 Q. Mr. Backstoce, again, what was said and by whom at this conversation?
 A. The things we were discussing with Johnny and, of course, *the girl that was missing.* And during the discussion—

main opinion quotes Mr. Backstoce's testimony and states that it "clearly refers solely to the defendant's explanation of the dream that had awakened him." This statement is not accurate. Mr. Backstoce indicated that defendant, himself and his wife (defendant's sister) had a discussion concerning the missing girl (Phyllis Ady) after being awakened by one of defendant's nightmares. In the context of that discussion, *i.e.,* regarding Phyllis Ady, Mr. Backstoce testified that defendant related to them the following condemning statement: "Well, John [defendant] said that he was walking the girl home and the girl slapped him and that was the last thing he remembered till he woke up taking a bath in the tub." Contrary to the conclusion reached in the main opinion, no mention at all was made of dreams. The statements in the conversation refer to an actual occurrence, and Phyllis Ady is definitely the subject of the conversation.

The next witness called by the State to testify concerning defendant's statements was Alisa Backstoce, defendant's sister.[8] Although the main opinion concludes that her testimony refers entirely to the content of the defendant's dreams, it admits that part of her testimony could be interpreted to refer to an actual occurrence. Mrs. Backstoce's testimony regarding the conversation between herself, her husband and defendant at the kitchen table after his second nightmare, is for the most part consistent with that of her husband. However, unlike her husband's testimony, she refers to the matter as a dream. It is noted, also, that her testimony includes an additional part of the dream that Mr. Backstoce did

> Q. Okay, would you please tell us who said what.
> A. Well, John said that he was walking *the girl* home and *the girl slapped him and that was the last thing he remembered till he woke up taking a bath in the tub.* [Emphasis added.]

**8.** Mrs. Backstoce's testimony, in pertinent part, reads:

> Q. Mrs. Backstoce, can you tell me in substance and effect what was said and by whom in this conversation around your kitchen table?

not mention: the girl's folks had come to defendant's house searching for her. This correlates with the fact that Mrs. Westman went to the defendant's house on the eve of December 12 in search of Phyllis Ady.

Perhaps the most important part of Mrs. Backstoce's testimony is that part which the main opinion regards as being subject to interpretation that it refers to an actual occurrence. *After* her account of her brother's statements concerning his nightmares, Mrs. Backstoce was asked if the defendant said anything else about the *girl.* Her answer was: "*Later* he said he thought he had hurt or killed *a* girl, but he wasn't sure." (Emphasis added.) This statement, when considered in light of Mr. Backstoce's testimony that the conversation at the kitchen table involved the "missing girl," could reasonably and justifiably be interpreted as referring to an actual occurrence involving the victim. Notwithstanding this interpretation is most consistent with the jury's verdict, and furthermore is acknowledged by the main opinion, it is rejected by the Court.

The third witness to testify regarding the alleged admissions was the defendant's brother, Robert Petree. Robert Petree, who was living in California at the time of the incident, was contacted by the Cedar City Police and questioned as to the whereabouts of his brother, the defendant. He was informed that his brother was being sought out for questioning regarding the disappearance of Phyllis Ady, and he pledged his assistance in finding his brother and returning him to Cedar City.

> A. We asked Johnny what his nightmares was about. He said he was having a nightmare about walking with a girl and *she slapped him and that's all he remembered, and then waking up taking a bath and her folks, the girl's folks pounding on the door wanting to know where she was.*
> Q. All right. Did he say *anything else about the girl, other than* just what you've told us?
> A. *Later* he said he thought he had *hurt or killed a girl,* but he wasn't sure. [Emphasis added.]

He eventually found his brother at his sister's house in Las Vegas, Nevada. Upon confronting defendant, he told him that the police were searching for him in connection with the Phyllis Ady disappearance and that he was going to have to return to Cedar City. Defendant expressed his unwillingness to return.

In defendant's presence, his sister told Robert Petree about the nightmares. A conversation then ensued between defendant and Robert. Robert did not ask him specifically about the dreams; he rather asked him what was bothering him. (Keep in mind that Robert had just informed defendant that the police were searching for him in connection with the Phyllis Ady matter.) Defendant's response, as Robert relates it, was not in reference to a dream at this point in the conversation.[9] Walking through the field, being slapped and blacking out appear to be the facts. After these facts are stated, the account of the dreams begins.[10] The account is incoherent and consequently very difficult to interpret.[11] It is not clear whether defendant *blacked out* in his dream or *blacked out* and then began to dream. The State argued that the black out occurred at the time defendant killed Phyllis Ady, and that the dreams that he had hurt or possibly killed her were mere fill-ins of the actual event. This reasoning is conceivable, especially in light of the testimony given by Debra Wilson concerning a later statement made by defendant, which was totally unrelated to the dreams, *infra.*

The main opinion emphasizes the fact that on cross-examination, Robert Petree told defense counsel that his testimony was the account of a *dream* that defendant had. However, the foregoing analysis of his testimony, being an analysis favoring the jury's verdict, reveals that only a part of his answers actually referred to the defendant's dreams; the remainder were clearly outside the dream context.

Also proffered by the State as an admission of defendant's guilt was a statement he made to Debra Wilson.[12] Miss Wilson had dated defendant in 1979 and 1980 while he was living in California. She testified that he told her he had gotten into a fight with a girl in Utah, and that he had gone home afterwards and could not remember anything. No mention was made of any dreams. Defendant simply related the incident as an actual occurrence.

The main opinion considers Debra Wilson's testimony to be inconsequential, and furthermore, determines that it "adds nothing of substance on this issue." I cannot agree. When considered along with the testimony of Mr. and Mrs. Backstoce and Robert Petree, and when viewed in a light most favorable to the jury's verdict, it reasonably supports an inference of defendant's guilt. Because there was no doubt that defendant was relating an actual occurrence to Debra Wilson, it would have been reasonable for the jury to conclude that defendant's statements to the other three witnesses concerning an altercation with a female and a black out, or lapse of

---

**9.** "Well, he proceeded to tell me that he was walking through a field with—I took it as a young girl. He didn't say what girl or who it was, but she slapped him. He blacked out. And then he goes on from there to say about the dreams."

**10.** "And then he *goes on from there* to say about the *dreams.*" (Emphasis added.)

**11.** "What he told me about the dream, that when he blacked out and he *started* to dream that he—his words were he thought he hurt her. He thought he might have killed her." (Emphasis added.)

**12.** The relevant portion of Miss Wilson's testimony is as follows:

Q. Again, Miss Wilson, can you tell me in substance and effect what was said and by whom in this conversation ....
A. He had told me that *he had gotten in a fight with a girl in Utah.* He didn't mention any names. And *he came home and he couldn't remember nothing afterwards.*
Q. All right, did he say anything else about what condition he was in when he came home?
A. Just that he remembered getting in a fight and I guess he had *blood on his shirt;* that was what was mentioned, and *he couldn't remember nothing.* [Emphasis added.]

memory, were not mere products of his imagination derived from dreams, but rather actual admissions of definite occurrences. To sustain such a conclusion would certainly not require undue stretching of the evidentiary fabric.

Although it is not *absolutely* clear from the record that *all* of defendant's statements referred to an actual occurrence, it was clear beyond a reasonable doubt to the jury, as they sat and listened first hand to the witnesses, that these statements, be they accounts of dreams, actual occurrences or a mixture of both, implicated defendant as the perpetrator of the homicide. This Court has noted that:

> [I]t is not the function of an appellate court to make findings of fact because it does not have the *advantage of seeing and hearing* the witnesses testify.[13] [Emphasis added.]

Accordingly, this Court should adopt an interpretation of these statements consistent with the jury's findings and ultimate verdict.

A fact wholly ignored by the main opinion, yet one which definitely lends credence to the trial court's judgment, is that defendant was known to have an explosive temper. Mr. Paul Jeffries, a tenant at defendant's home, gave testimony of this fact on behalf of the State. This fact, coupled with the foregoing admissions, permits an inference that when defendant was slapped by the victim he lost his temper, reacted violently and took the victim's life.

In conclusion, the main opinion suggests that even if the evidence were sufficient to prove that defendant caused Phyllis Ady's death, it is not sufficient to prove that he did so "intentionally or knowingly," as required for a conviction of second degree murder.

This Court recognizes the elementary principle of criminal law that specific intent may and ordinarily must, be proven by circumstantial evidence.[14] An appropriate and recent articulation of this rule is:

> [I]ntent may be proven and often must be proven in criminal prosecution by circumstantial evidence and the reasonable inferences to be drawn therefrom. The weight to be ascribed to such evidence is a determination within the province of the jury.[15]

This is not a case of first impression in this jurisdiction.[16] The law in Utah, as well as in most jurisdictions, clearly permits a conviction of second degree murder and proof of the elements thereof based on inferences drawn from surrounding circumstances.[17] The issue is simply whether the facts surrounding this case and the evidence proffered by the State provided the jury with a reasonable basis from which to draw such inferences.

In the instant case, the State showed that Phyllis Ady's body was forced into the carrot pit in a reverse fetal position and partially buried to avoid detection. These facts certainly permit a reasonable inference that defendant's conduct was animated by the specific intent necessary for second degree murder. Furthermore, Paul Jeffries, a tenant at defendant's home, testified that defendant had an explosive temper. This fact, coupled with defendant's admissions in which a girl had slapped him, would support a reasonable inference that at the moment he was slapped, and in his anger, he formed the intent to kill Phyllis Ady or knew that his subsequent conduct would result in her death. Viewing the evidence and reasonable inferences there-

---

13. *Rucker v. Dalton,* Utah, 598 P.2d 1336, 1338 (1979). *See also Mendelson v. Roland,* 66 Utah 487, 243 P. 798 (1926).

14. *See State v. Murphy,* Utah, 617 P.2d 399 (1980); *State v. Kennedy,* Utah, 616 P.2d 594 (1980); *State v. Cooley,* Utah, 603 P.2d 800 (1979).

15. *State v. Wilkins,* 1 Hawaii App. 546, 622 P.2d 620, 624 (1981).

16. *State v. Canfield,* 18 Utah 2d 292, 422 P.2d 196 (1967).

17. *Id. See also State v. Wilkins, supra* n. 16; *State v. Woods,* 222 Kan. 179, 563 P.2d 1061 (1977).

from, as well as the inference that an actor generally intends the ultimate consequences of his acts,[18] in a light favorable to the jury verdict, defendant has simply failed to show that the evidence was "so inconclusive or insubstantial that a reasonable person must have entertained a reasonable doubt" that the State proved intent for second degree murder. Therefore, the jury verdict and the judgment rendered thereupon should be left undisturbed.

**18.** *State v. Walton,* Utah, 646 P.2d 689 (1982).

I would affirm the judgment and sentence of the trial court.

DURHAM, J., concurs in the dissenting opinion of HALL, C.J.

