**STATE of Utah, Plaintiff and Respondent,**

v.

**Bryan WALKER, Defendant and Appellant.**

**No. 20921.**

Supreme Court of Utah.

Aug. 25, 1987.

George B. Handy, Ogden, for defendant and appellant.

David L. Wilkinson, Earl F. Dorius, Salt Lake City, for plaintiff and respondent.

DURHAM, Justice:

Defendant was charged and convicted in a bench trial of two counts of aggravated sexual abuse of a child. He was thereafter sentenced to a statutory minimum mandatory sentence of three years to life on each count, both terms to run concurrently. Defendant has appealed on the ground that there was insufficient evidence to prove that he was an adult when he committed the offenses. He also raises four additional points on appeal: first, that the trial court erred in excluding the testimony of two defense witnesses; second, that the trial court erred in allowing certain witnesses to testify to out-of-court statements by the victims; third, that the prosecutor improperly led the victim witnesses in direct examination; and, fourth, that the

court erred in not granting the defense motion for a new trial. We reverse on the ground of insufficiency of the evidence.

This Court has had a well-established standard of review of verdicts in criminal cases, which we have applied to both jury and bench verdicts. When reviewing the sufficiency of evidence supporting a conviction, we have said that we will overturn a verdict "only when the evidence is so lacking and insubstantial that a reasonable person could not have reached that verdict beyond a reasonable doubt." *State v. Isaacson,* 704 P.2d 555, 557 (Utah 1985); *State v. Tanner,* 675 P.2d 539, 550 (Utah 1983); *State v. Petree,* 659 P.2d 443, 444 (Utah 1983) (review of a jury verdict).

On January 1, 1987, however, new Utah Rule of Civil Procedure 52(a) took effect, providing:

In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58A; in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. *Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.*

(Emphasis added.) Rule 52(a) applies in criminal cases by virtue of Utah Code Ann. § 77–35–26(g) (1982), which provides: "The rules of civil procedure relating to appeals shall govern criminal appeals to the Supreme Court except as otherwise provided." *See also* Utah R.Civ.P. 81(e) (civil procedure rules apply in the absence of contradictory rule of criminal procedure).

The language of Rule 52(a) is similar to the Federal Rules of Civil Procedure. Federal case law has defined the standard of review in the federal rule and Wright &

Miller summarizes that standard as follows:

> [I]t is not accurate to say that the appellate court takes that view of the evidence that is most favorable to the appellee, that it assumes that all conflicts in the evidence were resolved in his favor, and that he must be given the benefit of all favorable inferences. All of this is true in reviewing a jury verdict. It is not true when it is findings of the court that are being reviewed. Instead, the appellate court may examine all of the evidence in the record. It will presume that the trial court relied only on evidence properly admissible in making its finding in the absence of a clear showing to the contrary. It must give great weight to the findings made and the inferences drawn by the trial judge, but it must reject his findings if it considers them to be clearly erroneous.

Wright & Miller, *Federal Practice and Procedure* § 2585 (1971) (citations omitted.)

The definition of "clearly erroneous" in the federal rule comes from *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948):

> A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

Further clarification is offered by Wright & Miller:

> The appellate court ... does not consider and weigh the evidence de novo. The mere fact that on the same evidence the appellate court might have reached a different result does not justify it in setting the findings aside. It may regard a finding as clearly erroneous only if the finding is without adequate evidentiary support or induced by an erroneous view of the law.

Thus, the content of Rule 52(a)'s "clearly erroneous" standard, imported from the federal rule, requires that if the findings (or the trial court's verdict in a criminal case) are against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made, the findings (or verdict) will be set aside.

■ Although we have applied the new Rule 52(a) since its effective date, *see, e.g., Ashton v. Ashton,* 733 P.2d 147 (Utah 1987); *Lemon v. Coates,* 735 P.2d 58 (Utah 1987), we have not examined the impact of drawing from the federal rules in the promulgation of our new Rule 52. Therefore, we disavow language in our earlier cases describing or implying a standard under new Rule 52(a) which differs in any significant respect from the standard of review applied in this case. We further specify that we will hereafter apply the standard adopted in this case to bench trials in criminal cases, and not the standard in *State v. Isaacson, State v. Tanner,* and *State v. Petree.* In that regard, we abandon the pre-Rule 52(a) position that the standard of review in criminal cases must be the same for both jury and bench verdicts. Not only does Rule 52(a) require this shift, but also we believe it to be an appropriate recognition of the relative deference owed to multi-member panel decisions as opposed to single-judge findings.

Having delineated the proper standard of review, we summarize the facts testified to at this trial. Defendant began babysitting for the victims, "J." and "T.," in the spring of 1983. Defendant cared for the girls for the last time on October 14, 1984, three days after his eighteenth birthday. Defendant testified that in November 1984, he contacted his bishop in the L.D.S. Church and told the bishop that he had "touched [J. and T.] in places that I shouldn't have" during the summer of 1983 but that nothing had happened since. The bishop referred defendant to a social worker with the Utah Division of Family Services (DFS), who interviewed defendant. Defendant testified that he also told the social worker that nothing improper had occurred since 1983. The social worker recommended that defendant talk to the victims' mother (Mrs. H.), who was very close to defendant and his family.

Defendant followed the social worker's recommendations and spoke with Mrs. H. in January 1985. Following that conversation, Mrs. H. contacted the police. She had an initial interview with Officer John Stallings and met subsequently with Officers Rose Hillman and Diane Hancock. Officer Hillman interviewed the victims at the police station, and Officer Hancock interviewed the victims at their home. At that time, the family lived in South Ogden. The evidence established that they had resided on Adams Street in Ogden until approximately February of 1984. The victims apparently stayed with defendant's family for several months (January to April) because their mother was having medical problems. Thereafter, in April of 1984, they moved to South Ogden.

Prior to trial, defendant made a motion to dismiss based on lack of jurisdiction in the district court. The trial court denied the motion and ruled that the issue of when the offense was committed should be determined at trial. The State's position was that defendant molested the children on the last occasion on which he cared for them, three days after his eighteenth birthday. Defendant maintained that the only instances of abuse occurred more than a year earlier, in the summer of 1983.

The victims gave extraordinarily confused and contradictory testimony at trial. T. and J., who were ten and six respectively at the time of trial, were both inarticulate and appear from the transcript to have been extremely intimidated by the courtroom setting. As a result, the trial court permitted the prosecutor to lead extensively, over the objection of defense counsel. Officer Hancock was allowed to testify, also over defense objection, to out-of-court statements made to her by the girls, some of which tended to show that the offenses were committed on the October date, or at least at the South Ogden residence. Similarly, a seventeen-year-old acquaintance of the victims was allowed to relate that T. had told her that the abuse occurred "five or ten" times and in South Ogden.

Mrs. H. testified that defendant told her the abuse had occurred "since" the summer of 1983, which she understood to mean that the abuse had been ongoing until a few months prior to their conversation in January.

Defense counsel called two witnesses, defendant's bishop and the DFS social worker he saw in November 1984, to testify about what defendant told them concerning the time the offenses occurred. After a proffer indicating they would testify that defendant told them the abuse occurred in 1983 and not thereafter, the trial court determined that defendant's out-of-court statements did not qualify as an exception to the hearsay rule under Rule 804(b) because they tended to "exonerate" him of the charge for which he was on trial by establishing his status as a juvenile.

Defendant took the stand and testified that the touching had only occurred twice, both times in the summer of 1983. He also denied that the girls had touched his genitals, as they claimed in their testimony, or that he had ejaculated. (Defendant did not appear to know the meaning of this term and the prosecutor had to explain it to him). Defendant further testified that he got no pleasure from the acts, that he was not sexually attracted to the girls, and that he had "never" ejaculated in his life (Again, from the context of the question and answers, it is not entirely clear if defendant knew what the prosecutor meant by the word.)

Following the trial, defense counsel moved for a new trial and produced an affidavit of a friend of the victims' mother which stated that Mrs. H. had told the affiant in September of 1984 that she had deliberately "educated" her girls about sex by having them watch sexual intercourse and other sexual activities between her and her boyfriend. The trial judge denied the motion but granted a certificate of probable cause based on the ground of newly discovered evidence.

Our review of the record causes us to conclude that this was an unusually difficult case on its facts. Because of the problems the victims experienced in court, the direct examination, as well as the cross-examination, was conducted exclusively by

leading questions. Whereas there is no doubt that defendant abused the victims, especially because he admitted the abuse and described it in his own testimony, we find that there is overwhelming doubt about the timing and location of the abusive incidents. To illustrate the lack of substantial evidence on that issue, we summarize some of the numerous problems in the testimony:

1. As J., aged six, the first witness at trial, began her testimony on direct examination, the prosecutor repeatedly directed her attention to "the last time Bryan babysat," and at one point said, "you told us that you remembered when Bryan babysat the last time," when the witness only testified that it occurred in South Ogden. She shook her head in the negative when asked if it was before or after Halloween and if she remembered "telling Diane it was at Halloween." J. was, by the prosecutor's own description, "paralyzed" during the trial with fear and self-consciousness. At one point, she said that it was "warm" and summertime the last time Bryan babysat for her. She said that she didn't know where her mother was during the evening of October 14th and that her mother had told her afterward that it was the night she had gone to a church "fireside" meeting with a friend. She said that the "last time" the incidents with Bryan occurred was at the Adams Avenue home and, a few moments later, that the touching "happened [at] both [homes]." She essentially agreed with whatever either counsel suggested to her through leading questions, thereby changing her testimony dramatically with each successive round of questions.

2. Likewise, T., aged ten, had great difficulty testifying. She said first that the last time Bryan babysat was in Ogden. Later she said she didn't know whether it was warm or anywhere near Halloween when the last instance of abuse took place. When asked "how many times before did [defendant] do this," she replied, "none." On one page of the transcript she said that the touching did not occur in South Ogden and, on the next, that the touching only occurred once and that it took place in South Ogden. She agreed that the incident

had occurred in the "summertime" and that she was not in school at the time. Upon questioning about the occasion on which she showed Officer Hancock her mother's waterbed and described it as the location of the abuse, T. agreed when counsel suggested that it was "the same bed" but "not the same bedroom" and a "different bedroom" from the one in which Bryan had touched her. When the prosecutor tried to rehabilitate that statement by asking, "When Diane came, you took her into the bedroom that this happened in?" she answered "no." T. also changed her testimony to basically agree with either counsel's leading questions.

3. Mrs. H.'s testimony was the only solid evidence linking defendant's admitted acts to a time after his eighteenth birthday. She testified that defendant told her "he'd been doing it since the summer of 1983, which told me that he was still doing it. That it was still a problem, not that he had done it then and not done it since." She also said that "he just said that he hadn't done it in several months." She verified that defendant had been trying to arrange to speak to her privately for a number of weeks, which was consistent with his testimony that he confessed to her on the recommendation of the DFS social worker. Mrs. H. also admitted, however, to being stunned by defendant's communications to her and had difficulty trying to "assimilate" them. She further acknowledged experiencing great stress and confusion as a result of the revelations, creating a possibility that she misheard or misunderstood the specifics of defendant's statement. That possibility is underscored by the fact that the next day she talked to Officer Stallings, who completed a contemporaneous report of his interview which states that the "mother didn't know when it happened," and he testified at trial that he had no recollection of her saying that it occurred the last time the defendant babysat the children. Because it would have been significant information to him from the point of view of investigating the crime (significant, in fact, to the question of whether his department even had jurisdic-

tion), Officer Stallings was sure at trial that he would have made a note of all statements by Mrs. H. concerning location. His report recorded that "[Mrs. H.] is unsure at this point as to where the sexual assault took place, as she lived at 2651 Adams and also 564 29th St." He testified that she never told him the abuse occurred in South Ogden and never identified any place except the two foregoing addresses where it was likely to have occurred: "If she had told me it happened in South Ogden for sure I would have had it in my report."

The foregoing testimony of Officer Stallings, directly contradicts Mrs. H.'s insistence at trial that defendant "just said he hadn't done it in several months" and later "He said the last time it happened was the last time he babysat." Mrs. H. only recounted the latter statement after difficult cross-examination, during which she became quite hostile to defense counsel; she did not recount it on direct examination, during which she referred only to the first statement described above. Nor did she include it in her report to Officer Stallings, which would have been expected since defendant had cared for the children at least four to six times at the South Ogden address and the family had lived there six months by the time defendant babysat for the last time.

This discrepancy between Mrs. H.'s contemporaneous report the day after her conversation with defendant and her testimony at trial about what defendant told her that night raises a serious question about the accuracy of her recollection at trial. Furthermore, Mrs. H. displayed considerable (albeit quite understandable) hostility toward defendant and defense counsel at trial and made it clear that she believed that T. had definitively said in earlier communications that she was abused during a period of time when she was at H. Guy Child School, her elementary school in South Ogden. Mrs. H. further made it clear that she believed T.'s statement and was therefore convinced that T. had been molested in October in South Ogden. Her motivation, then, for transposing subsequently acquired information back into the original

revelations from defendant was strong. Again, although such motivation is certainly understandable in one whose trust and affection for defendant had been so terribly betrayed, it does cloud the reliability of her account of defendant's statements, especially because the police officers to whom she originally described the communication did not corroborate her version.

4. The testimony of Officer Hancock, upon which the trial judge appeared to rely quite heavily in his determination of the time of the last instance of abuse, does not in our view justify such reliance. Officer Hancock acknowledged that a transcript of her tape-recorded interview with T. on January 28, 1985, shows that T. denied, when specifically asked by Hancock, that the abuse had ever happened "in this house" (the South Ogden residence). In fact, Officer Hancock acknowledged that the interview transcript did not indicate where the events occurred.

5. The trial court also appeared to rely to a large extent on the judge's assessment that defendant's "statement is cleansed so far of normal things that the court does not believe him." Certainly, we must defer to the trial court on matters of credibility, but we are disturbed by three significant problems in the trial court's assessment of credibility. First, it appears that the trial court referred in part to defendant's testimony that he had never ejaculated in his life. But, as we have noted earlier, the exchanges in the transcript suggest that defendant was unusually unsophisticated about sexual terminology and appeared not to understand the term "ejaculate" when it was first used.

Second, although defendant admitted only to touching the victims and not to making them touch him, he did respond in considerable detail and with obvious candor when asked on cross-examination to describe his serious sexual misconduct with them. This undercuts the trial judge's conclusion that defendant's testimony was self-protective.

■ Third, the trial court accepted a proffer of testimony from defendant's

L.D.S. bishop and the DFS social worker with whom he spoke in November of 1984 to the effect that defendant told them that the abuse had occurred only in 1983. The court refused to admit the evidence when it was offered at the beginning of defendant's case under Rule 804, Utah Rules of Evidence. That refusal was proper because Rule 804(b)(3), upon which the defense relied, only affects hearsay statements "if the declarant is unavailable as a witness," and defendant was available at trial. The judge further indicated to defense counsel that the witnesses might be allowed to testify at another point in the trial (presumably after defendant's testimony) if their testimony qualified under Rule 801, also a correct statement of the law. For reasons which are unexplained, the defense never re-called the witnesses. The State, however, argues in its brief on appeal that after defendant testified that he had told both of the witnesses that the abuse had not recurred since 1983,

> The prosecutor did not challenge that testimony; he accepted the truth of defendant's claim that such a report had been made to Bishop Bowen and Sindi Noble. Under those circumstances there was no need for Bishop Bowen or Sindi Noble to rehabilitate defendant's testimony because it was not called into question. Consequently, it is doubtful that the testimony could have, at that time, been admitted under Rule 801.

Although this point supports the State's position that the trial court committed no error in excluding the witnesses, it adds considerably to the troublesome problem of defendant's credibility. If even the prosecutor acceded to the truthfulness of defendant's claim that in the course of a voluntary confession of serious misconduct to an ecclesiastical leader, and subsequently to a civil agency representative, he specifically denied any wrongdoing in October of 1984, it makes unlikely the proposition that defendant would have told Mrs. H. the opposite story a few weeks later, as she claims he did.

To conclude our analysis of the evidence and decision-making process below, the trial transcript shows that the trial judge relied on the following conclusions in finding that defendant was eighteen years old on the occasion of his last abuse of the victims in this case: (1) Mrs. H. said defendant told her that the abuse occurred on the last occasion he took care of the children—"Not only does she tell ... that to me now, but she told that to the officers early that she interpreted it to mean addresses and on through [sic]"; (2) the victims' "first account to Officer Hancock was interpretable only that it occurred in South Ogden at that location and at about that time"; (3) "[t]here's no question that T.'s description of the event to the seventeen-year-old girl is capable of only that interpretation that it occurred at least once in South Ogden and near the end of the event, and it involved at least those things"; and (4) "I believe [defendant's] statement is cleansed so far of normal things that the court does not believe him. The court deems his credibility at this time has become protective to the point where his testimony is no longer credible."

As our earlier discussion suggests, we are unable to accept the trial judge's foregoing conclusions as reasonable. To summarize the problems we have identified in the evidence: First, although Mrs. H. did testify at trial that defendant told her he had abused the children the last time he babysat, there was absolutely no evidence that she told that to the police when she talked to them the day after her conversation with defendant (but before she had heard the childrens' information). The evidence is entirely to the contrary, namely, that she gave Officer Stallings two former addresses as likely locations, but not the current South Ogden address. Furthermore, her testimony exhibited a strong motivation to distort her recollection of defendant's statements in order to ensure his conviction in the adult system. Second, contrary to the trial judge's conclusion, the evidence regarding Officer Hancock's interviews with the children tends to show that the abuse the children described occurred in Ogden, not in South Ogden. Third, the testimony of the seventeen-year-old acquaintance was so astonishingly ambigu-

ous and without foundation as to be, in our view, totally unreliable. It was not even definitive on the issue for which the trial court cited it, since the witness said, at different times, that T. had told her the abuse occurred only "before" the move to South Ogden, "after" the move, and "before and after." All of her responses were to suggestive and leading questions, she was unfamiliar with and/or unable to use even the most common of anatomical references, she only met T. once and had a casual conversation with her months after the charges were filed in this case, and she acknowledged being a close friend of Officer Hancock's, who "helped me out in my case" (a reference not explained in the record). Taken all in all, we cannot see how her testimony can be deserving of any weight.

■ Finally, the issue of defendant's credibility is very troublesome. While we acknowledge the trial judge's ability to assess demeanor and credibility, we are unable to understand how he dealt with the problems of defendant's voluntary confession and the strong likelihood that the contents of that confession were truthful. The State concedes that defendant told the truth at trial when he said he had told his bishop and his social worker that he had not abused the children since 1983. Even if his confession were untrue in that regard, there is no explanation whatsoever for the assertion, denied by defendant at trial, that he told Mrs. H. a few weeks later, in the course of a similar confession (and one recommended by the social worker), that he had abused them in October of 1984. As a result, it is unreasonable in our view to accept Mrs. H.'s assertion without some corroboration. Not only is such corroboration missing from the evidence, but also the evidence of what she did say to the police immediately after talking to defendant tends to corroborate his version of what he told her.

■ Because the evidence in the record does not support the trial court's conclusions, we are constrained to disagree with them. We are convinced that the State failed in this case to meet its burden of eliminating all reasonable doubt that defendant committed a crime when he was eighteen years old. We emphasize that all of the persons involved in this case recognized and acknowledged that defendant only cared for the children on one occasion at their South Ogden residence after his eighteenth birthday. Therefore, the State had to prove beyond a reasonable doubt that the abuse charged occurred on that date and at that location. While there is no question that serious abuse occurred, and defendant admitted it, there is in our minds a serious doubt that it was committed on October 14, 1984, when defendant was an adult; therefore, we are left with the definite and firm conviction that the trial court erred. *United States v. United States Gypsum Co.*, 333 U.S. at 395, 68 S.Ct. at 541. Further, we specifically hold that such doubt is reasonable based on the evidence at trial.

■ One final matter requires brief discussion. Because we are reversing based on insufficiency of the evidence on the element of defendant's age at the time of the offense, we do not rule on the question of whether the trial judge abused his discretion in denying the motion for a new trial based on newly uncovered evidence. We do note, however, that this is an unusual case, with many unanswered questions. It appears that one of the trial judge's major considerations in his verdict was his total lack of confidence in defendant's credibility. In particular, it seems likely that the trial judge may have been influenced by the victims' testimony that defendant made them stroke his penis and that they saw semen. That two children of their ages could describe such things strongly suggests that they had been exposed to them, whereas defendant denied both the touching and the ejaculation. The affidavit which defense counsel filed with his motion for a new trial contained evidence which, if true, would explain the testimony of the victims while leaving open the possibility that defendant was telling the truth about his actions. It could also possibly undermine the testimony of Mrs. H. Those possibilities could very well have shifted the

entire balance of the evidence concerning defendant's credibility. That the trial judge granted a certificate of probable cause on that question suggests that he recognized those possibilities. While it is true, as the State argues on appeal, that there was no explanation of the reason the defense did not discover the evidence in time for the trial, we nevertheless observe that the State's opposition to a new trial in this case appears to us overzealous. The crime for which defendant was convicted carries a minimum mandatory prison sentence of three years to life. If indeed defendant was only sixteen at the time of its commission, and we have determined that the evidence raises a reasonable doubt on that issue, the injustice resulting from prosecuting him in the adult system is extreme. Under the circumstances, if we had not reversed because of the insufficiency of the evidence, we would have reversed and ordered a new trial on the basis of the new evidence offered by the defense.

Reversed. The trial court is ordered to transfer this matter to the appropriate division of the juvenile court for further disposition according to statute.

STEWART, Associate C.J., and ZIMMERMAN, J., concur.

HALL, Chief Justice (dissenting):

I do not join the Court in reversing the conviction on the ground of insufficiency of the evidence.

This is not a case lacking in evidence. Rather, it is a case where the evidence is simply in conflict. In the face of conflicting testimony, the trial judge was called upon to assess the credibility of the witnesses. This he did, and I am not persuaded that the findings he made were without adequate evidentiary support or that they were otherwise clearly erroneous.

The trial judge found that the offenses were committed on October 14, 1984, a date after defendant's eighteenth birthday. That finding is supported by the testimony of both victims, who described in detail the incident of sexual abuse that occurred the day their mother went to a function with a friend, the date thereof being later estab-

lished as October 14, 1984. The judge's finding is also supported by the victims' mother, who testified that defendant told her that the molestations began in the summer of 1983 and continued through the last time he babysat the children on October 14, 1984.

Although the majority opinion recounts the conflicting evidence in considerable detail, the mere fact that on the same evidence this Court might reach a different result does not justify it in setting aside the trial judge's findings.

I am of the view that the majority of the Court has misapplied the clearly erroneous standard of review. I would affirm the judgment and conviction.

HOWE, J., concurs in the dissenting opinion of HALL, C.J.