**STATE of Utah, Plaintiff and Appellee,**

v.

**Bruce Dallas GOODMAN, Defendant and Appellant.**

No. 860116.

Supreme Court of Utah.

Sept. 9, 1988.

Rehearing Denied Nov. 4, 1988.

James L. Shumate, Cedar City, for defendant and appellant.

David L. Wilkinson, Earl F. Dorius, Salt Lake City, for plaintiff and appellee.

DURHAM, Justice:

Defendant Bruce Dallas Goodman appeals his conviction in a bench trial of second degree murder on the ground that there was insufficient evidence to convict him. We affirm.

Defendant was convicted of the murder of Sherry Ann Fales Williams, a 21–year-old woman. Ms. Williams' body was found the morning of November 30, 1984, near a freeway off-ramp at the Manderfield exit north of Beaver, Utah. She had been bound at the knees and wrists and was unclothed below the waist, with the exception of a pair of socks. An autopsy revealed that Ms. Williams had received at least eight severe blows to the head which caused her death. She also had several contusions and lacerations, including wounds to her hands and an anal injury which was inflicted by the introduction of a blunt object. In the snow near the body, the investigators found a partially smoked cigarette which had been smoked by a type "A" secretor.[1] Further, she had had sexual intercourse with a type "A" secretor within the previous 24 to 36 hours. Evidence at the scene also suggested that Ms. Williams had suffered extreme violence. Her skull was crushed and broken in several locations. Blood had been sprayed onto the snow by the blows, and the injuries to Ms. Williams' hands were very likely the result of unsuccessful attempts to thwart her attacker.

When reviewing a bench trial for sufficiency of the evidence, we must sustain the trial court's judgment unless it is "against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *State v. Walker*, 743 P.2d 191, 193 (Utah 1987); Utah

---

1. A type "A" secretor is a person with type "A" blood that secretes "A" antigens into body fluids. According to testimony at trial, 32 per-

R.Civ.P. 52(a).[2] As we explained in *Walker*, this standard accords "appropriate recognition of the relative deference owed multi-member panels as opposed to single-judge findings." *Walker*, 743 P.2d at 193. Under this less deferential standard, the likelihood that a defendant's conviction will be reversed following a bench trial, as opposed to a jury trial, is increased.[3] The clear weight of the evidence standard does not, as the dissenting opinion suggests, require that the defendant present the more compelling evidence at trial. Instead, this standard requires that the clear weight of the evidence presented at trial not be contrary to the verdict. If the weight of the State's evidence does not support the verdict, where the defendant presents no case, the verdict still must be reversed. Even if the clear weight of the evidence supports the verdict, however, this Court will reverse if it otherwise reaches a definite and firm conviction that a mistake has been made, thus providing the defendant an additional opportunity to obtain a reversal.

This approach does not diminish the presumption of innocence or the requirement that guilt be established beyond a reasonable doubt. Upon review, we accord deference to the trial court's ability and opportunity to evaluate credibility and demeanor. Without retrying cases before us, we cannot fulfill that particular function of trial courts. After the defendant has been found guilty beyond a reasonable doubt based upon the evidence, including the witnesses' demeanor and credibility, we will review the record to see if the clear weight of the evidence, not including demeanor and credibility, is contrary to the verdict. In reviewing a bench trial for sufficiency of the evidence, we require that the weight of the evidence, discounting questions of credibility and demeanor, not oppose the verdict. Hence, a defendant's conviction must still be based on evidence establishing guilt

beyond a reasonable doubt, but, on appeal, the standard of review aids the defendant in his efforts to obtain a reversal. Although this case is very close, we do not have a definite and firm conviction that a mistake was made, and we do not believe that the judgment is against the clear weight of the evidence.

■ Defendant and Ms. Williams met at the Arizona state fair, where they were both employed, in October 1984. They began living together in an intimate relationship. After the fair was over, they moved to the "Little Hotel" in Las Vegas, Nevada. While there, defendant was employed as a hired hand at the Snyder & Sons ranch, located south of Las Vegas.

On November 19, defendant asked his employer if he could borrow a pickup truck in order to move his personal belongings. Defendant did not return the pickup, but kept it for his personal use. The manager of the hotel confirmed that defendant and Ms. Williams moved out on November 19, but it is not clear where they went next. Defendant claims that he abandoned the stolen pickup on November 19 behind the Blue Diamond truck stop, locking the keys inside. This, however, is not true. The Las Vegas police officer responsible for patrolling the parking lot where defendant left the pickup testified that the truck was not there until shortly before he found it at 12:05 a.m. on November 30, the day Ms. Williams' body was found. Indeed, an eyewitness placed defendant and Ms. Williams together with the pickup in Nevada after the 19th of November.

A service station operator in Beatty, Nevada, 116 miles north of Las Vegas, positively identified defendant, Ms. Williams, and the stolen pickup as being at his station on or around November 22. The operator remembered defendant because of his distinctively decorated denim vest, the

cent of the general population falls into this category.

**2.** Rule 52 applies to criminal actions under Utah Code Ann. § 77–35–26(7) (Supp.1988) and Utah Rule of Civil Procedure 81(e).

**3.** When reviewing jury verdicts, we accord greater deference to the opportunity of twelve individuals to evaluate the evidence, and we will sustain the verdict if there is any evidence of substance that would allow a reasonable person to find the defendant guilty. *Walker*, 743 P.2d at 192.

"Hay for Sale" signs on the pickup, and his attempt to sell certain items (such as a chainsaw) that were in the back of the truck.

Approximately one week later, the night clerk at the Blue Diamond truck stop, located south of Las Vegas on Interstate 15, saw defendant and Ms. Williams arguing between 12:00 a.m. and 12:20 a.m. on November 30. The cashier remembered Ms. Williams because she asked for change several times that evening. Defendant, once again, was clad in his unusual denim vest and was notable because of his heavily tattooed arms.

At approximately the time that defendant and Ms. Williams appeared at the Blue Diamond truck stop, an officer for the Las Vegas Metropolitan Police Department discovered the stolen Snyder & Sons pickup in the Blue Diamond parking lot. The officer's meticulous records revealed that the pickup was not parked in the lot before that date and that it was discovered at 12:05 a.m. on November 30.

Ms. Williams apparently continued her journey with defendant, arriving at Mesquite, Nevada, between 2:00 a.m. and 4:00 a.m. An eyewitness identified defendant, based on his denim vest, unkempt appearance, and facial features, in the company of Ms. Williams in the Peppermill Casino in Mesquite. The witness worked at the casino as a keno runner. Her practice was to follow a particular route around the casino floor every few minutes collecting and returning keno tickets. Defendant remained in the same location, and the witness was thus able to observe him numerous times and from several different angles. Because of his failure to play any casino games and his unusually unkempt appearance, defendant stood out in the witness's mind. His uniqueness was underscored by the fact that defendant and Ms. Williams became involved in a heated argument. The witness was about to ask security to calm the dispute, when the argument apparently subsided. Defendant and Ms. Williams remained in the casino for a relatively lengthy period before leaving sometime before 4:00 a.m.

Thus, defendant and Ms. Williams were travelling north along Interstate 15 toward Utah and were positively identified twice in the nine hours immediately preceding the discovery of Ms. Williams' body.

Defendant's own testimony revealed that Ms. Williams was leaving defendant in order to return to her estranged husband. Defendant stated that this angered him, and he admitted that he had argued with Ms. Williams several times concerning this topic.

Defendant put on alibi evidence at trial, claiming that he was in California at the time of the murder. The trial court, however, did not believe this defense evidence and instead chose to believe the eyewitness testimony placing defendant with Ms. Williams a relatively short distance and time from the murder scene. From Mesquite, defendant and Ms. Williams could either return to Las Vegas or continue to Utah on Interstate 15. There are few places to stop between Mesquite and Beaver and therefore few places for Ms. Williams to have had the opportunity to encounter any other persons.

Finally, available physical evidence, although limited, is consistent with the trial court's judgment. Ms. Williams had engaged in sexual intercourse with a type "A" secretor within 24 to 36 hours prior to her death. Additionally, a cigarette, partially smoked by a type "A" secretor, was found alongside the body. Defendant was a type "A" secretor, while the victim was a type "O" secretor.

Without question, this is a close case. However, defendant's alibi was disbelieved by the trial court and so was found to be untruthful. Eyewitness testimony showed that defendant was arguing loudly with Ms. Williams just hours before her death. Upon review of the entire record and giving "due regard ... to the opportunity of the trial court to judge the credibility of the witnesses," Utah R.Civ.P. 52(a), we are not of a definite and firm conviction that a mistake was made. Therefore, we find the evidence sufficient to support the trial court's judgment. Further, we have reviewed defendant's other contentions on

appeal and hold that they are without merit. Judgment affirmed.

HALL, C.J., and HOWE, Associate C.J., concur.

STEWART, Justice (dissenting):

I respectfully dissent. The evidence in this case falls far short of proving that the defendant committed the crime charged. As a reviewing court, our duty in determining the sufficiency of the evidence in a criminal case is to determine whether the trier of fact, acting as a reasonable person, could have found beyond a reasonable doubt that the defendant committed the crime. Of course, both the majority and I must resolve all credibility issues in favor of the conviction and view the evidence in favor of it. However, the majority applies the wrong standard, I submit, for reviewing a conviction, i.e., whether the judgment is " 'against the clear weight of the evidence, or if the appellate court reaches a definite and firm conviction that a mistake has been made.' " In applying the "clear weight of the evidence" test, the majority obviously must weigh, and has weighed, one side's evidence against the evidence of the other side. That test is appropriate in civil cases, but not in criminal cases.

In my view, it is fundamentally erroneous in a criminal case to apply a clear-weight-of-the-evidence test in reviewing the sufficiency of the evidence. A defendant has no burden to produce any evidence at trial and may be acquitted even if he adduces no evidence at all. The State must prove its case beyond a reasonable doubt, irrespective of what the defendant does; the State cannot simply put on more convincing evidence than the defendant and win on the ground that its evidence outweighs, or is more persuasive than, the defendant's. It follows that application of the majority's clear-weight-of-the-evidence standard on appellate review will almost always result in an affirmance in a criminal case on appeal, no matter how weak the prosecution's case. Furthermore, when the defendant adduces no evidence at trial, application of the clear-weight-of-the-evidence test will always result in an affirmance of a conviction on appeal even if the evidence of guilt is very weak. Surely it cannot be the case that the State should prevail simply because the defendant adduced no evidence at trial.[1]

The second prong of the Court's test, that the judgment stands unless the Court "reaches the definite and firm conviction that a mistake has been made," also ignores the primary importance of the beyond-a-reasonable-doubt standard in the decision-making process. In truth, the second prong is wholly subjective, and moreover, it gives no recognition to the paramount importance of the burden-of-proof standard required by the Constitution. The standard of review employed by the majority leads it to accept the flimsiest kind of evidence in affirming the conviction in this case.

The majority's affirmance of the conviction rests entirely upon the proposition that the defendant was seen with the victim "a relatively short distance and time from the murder scene" and supposedly had a motive to kill the victim because she intended to leave him to return to her estranged husband. The last place the defendant and the victim were seen together was in the Peppermill Casino in Mesquite, Nevada, approximately five-and-a-half to seven-and-a-half hours before the victim's death. Mesquite is some 180 miles away from where the victim's body was found, at the Manderfield turnoff, north of Beaver, Utah. From that, the majority concludes that the evidence is sufficient to sustain the convic-

---

1. The majority argues that the clear-weight-of-the-evidence test does not require the defendant to present the "more compelling evidence at trial," but only requires that the "evidence presented at trial not be contrary to the verdict." The argument misses the point. The standard employed by the majority simply does not re-quire an assessment of whether reasonable people could find that the evidence was sufficient to prove the crime beyond a reasonable doubt. Instead, the majority simply balances or weighs the evidence to see if the "clear weight" is "contrary to the verdict." That is appropriate for a civil case, not for a criminal case.

tion.[2]

The majority opinion is devoted almost entirely to discussing events that occurred prior to November 30, 1984; but the critical time in this case is the early morning of November 30. Between 2 o'clock and 4 o'clock on that morning, the victim and the defendant were identified in the Peppermill Resort Hotel and Casino in Mesquite, by a keno waitress, the only person to see them.[3] From that time and place, *there is absolutely no evidence concerning the whereabouts and the activities either of the defendant or of the victim until the victim's body was found* at approximately 9:30 a.m., just after death occurred. The majority opinion purports to bridge that glaring gap in the evidence with one statement: "From Mesquite, defendant and Ms. Williams could either return to Las Vegas or continue to Utah on Interstate 15. There are few places to stop between Mesquite and Beaver and therefore few places for Ms. Williams to have had the opportunity to encounter any other persons."

That is hardly the case. Mesquite itself is a busy stop for gamblers and and a well-used truck and bus stop. In fact, while Goodman and Williams were in Mesquite, both a northbound and a southbound interstate bus stopped at the Peppermill Casino for a rest stop. Clearly, Ms. Williams could have hitched a ride at Mesquite with a trucker or in a passenger car. Indeed, Ms. Williams could have taken the bus to St. George. She certainly could have encountered other persons at a number of other places along the interstate: Bloomington, St. George, La Verkin, Cedar City, Parowan, and Beaver, among others. At any one or more of these places, the victim could have hitched rides with truckers and others, or if she was driving a car, she could have picked up a hitchhiker.

Critical to the majority position is the implicit assumption that Goodman and the victim left Mesquite together. But there is no evidence whatsoever that they did so. Neither the keno waitress nor anyone else saw them leave the casino. No one saw them leave Mesquite. There is *no evidence* as to when either one left Mesquite. There is *no evidence* that they left Mesquite together. The inference that they left together can only be made if one assumes the very fact in issue: that Goodman killed the victim.

Furthermore, there is *no evidence* at all as to how either one traveled to the Peppermill Resort Hotel in Mesquite;[4] there is *no evidence* that the defendant threatened the victim, although the keno waitress did say she saw them quarreling; there is *no evidence* as to when they left the Peppermill; there is *no evidence* that they left either the Peppermill Resort Hotel or Mesquite at the same time; there is *no evidence* as to how or with whom the victim traveled from Mesquite to the off-ramp north of Beaver; there is *no evidence* at all that the defendant traveled north to Utah rather than back toward Las Vegas, where he had left the pickup.

There is *no probative evidence* at all that the defendant was at the scene of the crime, and *the only evidence* that even bears on that issue is the partially smoked cigarette found near the victim's body which had been smoked by a type "A" secretor and the fact that defendant is a type "A" secretor. However, that evidence does not point to the defendant. The brand of cigarette found at the site was not the brand smoked by the defendant, and since almost one-third of the general population are type "A" secretors, as testified by the state crime lab analyst, Goodman's classification in that group does not even begin to prove, not even by a preponderance of evidence, much less beyond a reasonable

---

2. Other evidence relied on by the majority concerning the tissue type of the defendant is wholly nonprobative, as is shown below.

3. As required by standard appellate procedure, I take the evidence in the light most favorable to the conviction. For that reason, there is no need to discuss the defendant's alibi evidence.

4. The Snyder & Sons pickup truck the defendant and the victim had been travelling in was found by a Las Vegas police officer shortly after midnight, November 30, hours before the two were seen in Mesquite.

doubt, that the defendant was at the scene of the crime. In fact, based on the statistics given by the state crime lab analyst, if one randomly selected one hundred people, thirty-two would be type "A" secretors, and if one of the thirty-two committed the crime, the statistical probability that one could identify the guilty person by choosing one of the thirty-two is 3 per cent. In short, that evidence is so misleading and non-probative that it would not even have been admissible in a civil case to determine paternity. *See Kofford v. Flora,* 744 P.2d 1343 (Utah 1987).

Furthermore, *no other evidence* tied the defendant to the scene of the crime. In fact, the other evidence was exculpatory to the extent it was probative of the issue at all. Human hairs taken from the body of the victim all came from the victim's body, except one, which did not come either from the defendant or the victim, and was unidentified. The rope used to tie the victim before the grisly act was committed was of the general type often found on farms and ranches, but its weave was dissimilar to the rope found in the pickup truck that the defendant had left a few hours earlier in Las Vegas.

In sum, *there is no testimonial or inferential physical evidence* that ties the defendant to the crime. The foundation for the majority's opinion, like the foundation for the judgment of the trial court, is simply guesswork and speculation.

In *State v. Petree,* 659 P.2d 443 (Utah 1983), we held similar, but somewhat more probative, evidence insufficient to uphold a second degree murder conviction. In *Petree,* the defendant had been convicted upon evidence that (1) he was the last person seen with the victim, a schoolmate, before she disappeared; (2) he had departed the city the day following the victim's disappearance; (3) he had made statements which could be interpreted as referring to a dream or to actual occurrences to three family members about walking with a girl and then being slapped by the girl and his having hurt her or possibly killed her; and (4) he had made statements to another girl two years after the victim's disappearance

that he had gotten into a fight with a girl in Utah where he had gotten blood on his shirt and could not remember anything afterward. This Court concluded that this evidence, viewed in the light most favorable to the conviction, was insufficient to convict the defendant of a crime.

Clearly, the State should have to prove more than the fact that the defendant could have committed the crime because he was with the victim six hours before her death and had argued with her.

I believe that this conviction should be reversed.

ZIMMERMAN, Justice (dissenting):

I join the opinion of Justice Stewart, with the exception of the first three paragraphs, which criticize the standard of review.